Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:    516.741.4977
Facsimile:    516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICK BROWN,<br><br>                    Plaintiff,<br><br>            vs.<br><br>SWITCH, INC., ROB ROY, ANGELA ARCHON, JASON GENRICH, LIANNE PELETIER, ZAREH SRRAFIAN, KIMBERLY SHEEHY, DONALD SNYDER, TOM THOMAS, and BRYAN WOLF,<br><br>                    Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1)  Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(2)  Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Rick Brown ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder action against Switch, Inc. ("Switch" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts

to sell the Company to entities affiliated with DigitalBridge Investment Management ("DigitalBridge") and IFM Investors ("IFM," and together with DigitalBridge, "Parent"), through merger subsidiary Sunshine Bidco Inc., merger vehicles Sunshine Merger Sub, Ltd ("Merger Sub 1"), Sunshine Parent Merger Sub Inc. ("Merger Sub 2," and collectively with Merger Sub 1 and Parent, the "Consortium") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2.     The terms of the Proposed Transaction were memorialized in a May 11, 2022, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, each existing share of Switch's common stock will be converted into the right to receive $34.25 in cash, without interest. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction.

3.     Thereafter, on June 16, 2022, Switch filed a Preliminary Proxy Statement on Form PREM14A attaching the proxy statement (the "Preliminary Proxy Statement") with the SEC in support of the Proposed Transaction.

4.     The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff, as well as the Company's public stockholders. For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

5.     In violation of the Exchange Act, Defendants caused to be filed the materially deficient Preliminary Proxy Statement in an effort to Plaintiff, to vote in favor of the Proposed Transaction.  The Preliminary Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in violation of the Exchange Act.  As detailed below, the Preliminary Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Switch, provided by Switch management to the Board and the Board's financial advisors Morgan Stanley & Co. LLC ("Morgan Stanley") and Goldman Sachs & Co. LLC ("Goldman Sachs") and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by Goldman Sachs, if any, and provide to the Company and the Board.

6.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction.

## **PARTIES**

7.     Plaintiff is a citizen of California and, at all times relevant hereto, has been a Switch stockholder.

8.     Defendant Switch provides colocation space and related services. Switch is incorporated in Nevada and has its principal place of business at 7135 S. Decatur Boulevard, Las Vegas, NV.  Shares of Switch common stock are traded on the New York Stock Exchange under the symbol "SWCH."

9.     Defendant Rob Roy ("Roy") has been a Director of the Company at all relevant times.  In addition, Roy serves as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

10.     Defendant Angela Archon ("Archon") has been a director of the Company at all relevant times.

11.     Defendant Jason Genrich ("Genrich") has been a director of the Company at all relevant times.

12.     Defendant Lianne Peletier ("Peletier") has been a director of the Company at all relevant times.

13.     Defendant Zareh Sarrafian ("Sarrafian") has been a director of the Company at all relevant times.

14.     Defendant Kimberly Sheehy ("Sheehy") has been a director of the Company at all relevant times.

15.     Defendant Donald Snyder ("Snyder") has been a director of the Company at all relevant times.

16.     Defendant Tom Thomas ("Thomas") has been a director of the Company at all relevant times.

17.     Defendant Bryan Wolf ("Wolf") has been a director of the Company at all relevant times.

18.     Defendants identified in ¶¶ 9 - 17 are collectively referred to as the "Individual Defendants."

19.     The Consortium consists of two individual non-parties privately owned Investment Management firms.

20.    Non-Party Merger Sub is a wholly owned subsidiary of the Consortium created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

22.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the New York Stock Exchange which is headquartered in this District.

## SUBSTANTIVE ALLEGATIONS

### Company Background

24.    Switch, Inc. through its subsidiary, Switch, Ltd., provides colocation space and related services. It develops and operates data centers in Nevada, Michigan, and Georgia. The Company serves technology and digital media companies, financial institutions, government

agencies, and network and telecommunications providers, as well as cloud, IT, and software providers. Switch, Inc. was founded in 2000 and is headquartered in Las Vegas, Nevada.

25.     The Company's most recent financial performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated impressive financial success.  For example, in the February 24, 2022 press release announcing its 2021 Q4 and 2021 full year financial results, the Company highlighted annual revenue of $592.0 million, net income of $14.8 million, adjusted EBITDA of $315.1 million.

26.     Speaking on the positive results, CEO Defendant Roy said, "Switch's strong fourth quarter results capped off a transformational year for the company, highlighted by record financial and bookings performance, the launch of our fifth PRIME Campus, the successful acquisition and integration of Data Foundry, and our announcement to pursue a REIT conversion effective January 1, 2023,"….. "During Q4, we signed a two-megawatt commitment for LAS VEGAS 15, and expect the first sector to be substantially committed to clients upon its scheduled opening in Q2 2022. Looking ahead to 2022, we see one of the strongest sales pipelines in the company's history driven by robust client demand for our world-class exascale data center infrastructure."

27.     The sustained financial success and impressive results are not an anomaly, but rather, are indicative of a trend of continued future potential success by Switch.  Clearly, based upon the positive outlook, the Company is likely to have future success.

28.     Despite this upward trajectory, the Individual Defendants have caused Switch to enter into the Proposed Transaction without providing requisite information to Switch stockholders such as Plaintiff.

*The Flawed Sales Process*

29.     As detailed in the Preliminary Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.

30.     Notably, while the Preliminary Proxy Statement indicates that a "Special Committee" was created to run the sales process, it failed to disclose the powers of the Special Committee and whether it had the power to veto a potential transaction if it were not in the best interest of shareholders.

31.     The Preliminary Proxy Statement fails to disclose why it was necessary to engage the services of two different financial advisors. The Preliminary Proxy Statement also fails to disclose the scope of duties assigned to financial advisor Morgan Stanley in regard to the proposed Transaction. Further, the Preliminary Proxy fails to disclose the compensation paid, or that is still owed to Morgan Stanley in exchange for their services.

32.     Additionally, the Preliminary Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Parent, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Preliminary Proxy Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

33.     It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

34.     On May 11, 2022, Switch and the Consortium issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**LAS VEGAS, May 11, 2022 /PRNewswire/** -- Switch, Inc. (NYSE: SWCH) ("Switch") today announced it has entered into a definitive agreement with DigitalBridge Group, Inc. (NYSE: DBRG) ("DigitalBridge"), under which DigitalBridge Partners II, the value-added digital infrastructure equity strategy of the investment management platform of DigitalBridge, and an affiliate of global infrastructure investor IFM Investors ("IFM") will acquire all outstanding common shares of Switch for $34.25 per share in an all-cash transaction valued at approximately $11 billion, including the assumption of debt.

"Today's announcement is an important step towards our long-term vision for the growth and evolution of our company. Through this partnership we will be ideally positioned to continue to meet strong customer demand for Switch's environmentally sustainable Tier 5 data center infrastructure," said Switch Founder and CEO, Rob Roy. "Following our expansion into a Fifth Prime campus last year, and with our plan to construct more than 11 million additional square feet of capacity through 2030, Switch's strategic position has never been stronger. The combination of our advanced data center infrastructure, significant expansion capacity in our land bank, and a new partnership with experienced digital infrastructure investors lays a strong foundation for Switch's continued industry leading growth."

"This transaction provides significant and immediate value to our stockholders, and is a reflection of Switch's industry leading performance and differentiated technology," said Thomas Morton, President of Switch. "Through this transaction, we will remain at the forefront of growth and innovation within the data center industry. Following a robust evaluation of market dynamics and strategic review process by the company and its Board of Directors, we strongly believe that this is the optimal path forward for Switch and our shareholders."

Marc Ganzi, Chief Executive Officer of DigitalBridge, said, "At DigitalBridge, we are building the world's leading global digital infrastructure investment platform, and this transaction allows us to partner with one of the industry's fastest growing and highest quality data center portfolios. Rob and his team share our vision for the future of communications infrastructure, making us the ideal partner to scale their business both domestically and internationally to meet the exponentially rising demand from large enterprise customers looking for mission critical digital infrastructure. We are also pleased to partner with IFM Investors, one of the world's leading institutional infrastructure investors, to execute this compelling transaction."

"We have a proven track record of accelerating companies' time-to-scale by leveraging our deep domain expertise and access to capital," said Jon Mauck, Senior Managing Director of DigitalBridge Investment Management. "We look forward to supporting Switch's continued growth with the creative solutions and operational expertise necessary to scale these leading assets going forward. This fast-growing and renewables-powered business is a highly complementary fit within our expanding IM business and broader strategic priorities."

Kyle Mangini, Global Head of Infrastructure at IFM, said, "IFM is excited to partner with DigitalBridge and Switch on this transaction. We consider Switch to be an excellent digital infrastructure business with strong potential. The company is a recognized industry leader with an impressive approach to ESG. Today's announcement reflects IFM's strategy of investing in high quality infrastructure to protect and grow the long-term retirement savings of working people."

**Transaction Approvals and Timing**

The transaction, which was unanimously approved by a special committee of the Switch Board of Directors, is expected to close in the second half of 2022. The transaction is subject to approval by Switch stockholders and the satisfaction of other customary closing conditions. Upon completion of the transaction, Switch will no longer be traded or listed on any public securities exchange.

*Potential Conflicts of Interest*

35.     The breakdown of the benefits of the deal indicate that Switch insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Switch.

36.     Company insiders, currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company. Notably, while the Preliminary Proxy Statement provides the following information, it fails to account for the cash consideration which such shares will be exchanged for:

| Name of Beneficial Owner | Shares of Class A Common Stock | Rights to Acquire Shares of Class A Common Stock | Class A Common Stock Beneficial Ownership Percentage | Shares of Class B Common Stock | Class B Common Stock Beneficial Ownership Percentage | Class A Common Stock Beneficial Ownership Percentage — Assuming Full Redemption |
|---|---|---|---|---|---|---|
| *5% or more Stockholders* | | | | | | |
| Dennis Alan Troesh | — | — | — | 19,984,668 | 21.2% | 8.2% |
| Stella Roy | 48,645 | 1,276,734 | * | 13,552,107 | 14.4% | 6.0% |
| The Vanguard Group | 10,676,207 | — | 7.1% | — | — | 4.4% |
| City National Rochdale, LLC | 9,537,878 | — | 6.3% | — | — | 3.9% |
| *Named Executive Officers and Directors* | | | | | | |
| Rob Roy | 307,920 | 1,492,677 | 1.2% | 14,726,931 | 15.6% | 6.7% |
| Thomas Morton | 332,233 | 2,230,320 | 1.7% | 3,214,063 | 3.4% | 2.3% |
| Gabe Nacht | 145,135 | 750,937 | * | 337,353 | * | * |
| Melissa Young | 38,005 | 193,579 | * | 730,296 | * | * |
| Jonathan King | 45,135 | — | * | — | — | * |
| Angela Archon | 17,349 | — | * | — | — | * |
| Jason Genrich | 6,100 | — | * | — | — | * |
| Liane Pelletier | 17,349 | — | * | — | — | * |
| Zareh Sarrafian | 52,278 | — | * | — | — | * |
| Kimberly H. Sheehy | 52,278 | — | * | — | — | * |
| Donald Snyder | 465,075 | 99,438 | * | 400,000 | * | * |
| Thomas A. Thomas | 3,118,397 | — | 2.1% | 5,357,500 | 5.7% | 3.5% |
| Bryan Wolf | 36,987 | — | * | — | — | * |
| All directors and current executive officers as a group (13 persons) | 4,634,241 | 4,766,951 | 6.0% | 24,766,143 | 26.3% | 13.7% |

37.    Additionally, Company insiders, currently own large amounts of company options, restricted stock units, and other equity awards, all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company.   The Preliminary Proxy Statement gives an accounting of these amounts as follows:

| Name | Vested Stock Options (#) | Value of Vested Stock Options ($) | Unvested Stock Options (#) | Value of Unvested Stock Options (#) | Restricted Stock Units (#) | Value of Restricted Stock Units ($) | Performance Stock Units (#) | Value of Performance Stock Units ($) | Company Ltd. Common Units (#) | Value of Company Ltd. Common Units ($) | Shares of Common Stock (#) | Value of Common Stock ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current or Former Non-Employee Directors** | | | | | | | | | | | | |
| Angela Archon | — | — | — | — | — | — | — | — | — | — | 17,349 | 594,203 |
| Jason Genrich | — | — | — | — | — | — | — | — | — | — | 6,100 | 208,925 |
| Liane Pelletier | — | — | — | — | — | — | — | — | — | — | 17,349 | 594,203 |
| Zareh Sarrafian | — | — | — | — | — | — | — | — | — | — | 52,278 | 1,790,522 |
| Kim Sheehy | — | — | — | — | — | — | — | — | — | — | 52,278 | 1,790,522 |
| Donald D. Snyder | 99,438 | 1,715,306 | — | — | — | — | — | — | — | — | 465,075 | 15,928,819 |
| Tom Thomas | — | — | — | — | — | — | — | — | 5,357,500 | 183,494,375 | 3,118,397 | 106,805,097 |
| Bryan Wolf | — | — | — | — | — | — | — | — | — | — | 36,987 | 1,266,805 |
| **Current or Former Executive Officers** | | | | | | | | | | | | |
| Rob Roy | 1,492,677 | 35,109,651 | 402,539 | 8,370,933 | 429,078 | 14,695,922 | 544,394 | 18,645,495 | 14,726,931 | 504,397,387 | 307,920 | 10,546,260 |
| Thomas Morton | 2,230,320 | 44,308,868 | 227,976 | 4,668,628 | 228,682 | 7,832,359 | 279,576 | 9,575,478 | 3,214,063 | 110,081,658 | 332,233 | 11,378,980 |
| Gabe Nacht | 750,937 | 17,646,021 | 131,421 | 2,757,789 | 105,189 | 3,602,723 | 117,592 | 4,027,526 | 337,353 | 11,554,340 | 145,135 | 4,970,874 |
| Jonathan King | — | — | — | — | 172,098 | 5,894,357 | 33,304 | 1,140,662 | — | — | 31,234 | 1,069,765 |
| Melissa Young | 193,579 | 3,339,238 | — | — | 25,504 | 873,512 | 21,878 | 749,322 | 730,296 | 25,012,638 | 38,005 | 1,301,671 |
| Teresa Borden | 117,529 | 2,027,375 | — | — | — | — | — | — | — | — | 470,000 | 16,097,500 |

38.     In addition, certain directors and members of management of Switch and other persons known by certain executive officers of the Company are participants in Tax Receivable Agreement with the Company which will entitle them to substantial sums of money upon

consummation of the merger. The Preliminary Proxy Statement provides an accounting of such payments as follows:

| TRA Beneficiary | | TRA Payments |
|---|---|---|
| Rob Roy | $ | 11,727,391 |
| Thomas Morton | $ | 1,424,663 |
| Tom Thomas | $ | 13,353,127 |
| Donald Snyder | $ | 584,638 |
| Gabe Nacht | $ | 124,821 |
| Melissa Young | $ | 303,510 |

39.     In addition, certain employment agreements with certain Switch executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant and will potentially grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff. The compensation will be paid as follows:

| Named Executive Officer | Cash ($) | Equity($) | Perquisites / Benefits($) | Total ($) |
|---|---|---|---|---|
| Rob Roy | 5,399,753 | 41,712,349 | 19,046 | 47,131,148 |
| Thomas Morton | 3,235,397 | 22,076,465 | 29,804 | 25,341,666 |
| Gabe Nacht | 1,064,468 | 10,388,039 | 30,250 | 11,482,757 |
| Jonathan King | 752,740 | 7,035,019 | 30,530 | 7,818,289 |
| Melissa Young | 273,786 | 1,622,834 | — | 1,896,620 |

40.     The Preliminary Proxy Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

41.     Thus, while the Proposed Transaction is not in the best interests of Switch, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Preliminary Proxy Statement***

42.     On June 16, 2022, the Switch Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy Statement that, in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

43.     Specifically, the Preliminary Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy Statement fails to disclose:

a.   Adequate and specific discussion about the rights, authorities, and powers of the Special Committee;

b.   Adequate disclosure as to why the Company retained multiple financial advisors;

c.   Adequate disclosure of the compensation paid, or owed to Morgan Stanley;

d.   Adequate disclosure of the scope of Morgan Stanley's duties with respect to the proposed transaction;

e.  Whether the confidentiality agreements entered into by the Company with Parent differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties;

f.  All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including The Consortium, would fall away; and

g.  Adequate and complete disclosure of communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

### *Omissions and/or Material Misrepresentations Concerning Switch's Financial Projections*

44.     The Preliminary Proxy Statement fails to provide material information concerning financial projections for Switch provided by Switch management to the Board and Goldman Sachs and relied upon by Goldman Sachs in its analyses.  The Preliminary Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

45.     Notably the Preliminary Proxy Statement reveals that as part of its analyses, Goldman Sachs reviewed, "certain internal financial analyses and forecasts for the Company prepared by its management."

46.     Therefore, the Preliminary Proxy Statement should have, but fails to provide, certain information in the projections that Switch management provided to the Board, Goldman Sachs, and Morgan Stanley.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's

inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007)

47.     With regard to the *Summary of Switch Projected Financial Information* prepared by Switch, the Preliminary Proxy Statement fails to disclose material line items for the following metrics:

a.  Adjusted EBITDA, including all underlying necessary metrics, adjustments, and assumptions, including specifically: net income or loss, and the specific adjustments made for interest expense, interest income, income taxes, depreciation and amortization of property and equipment, amortization of customer relationships, supplemental adjustments, non-cash equity-based compensation expense, equity in net losses of investments, certain other items that Goldman Sachs believes are not indicative of the Company's core operating performance;

b.  Adjusted EBIT, including all underlying necessary inputs and assumptions used to calculate this metric, including specifically, depreciation and amortization and stock-based compensation;

c.  Unlevered Free Cash Flow, including all underlying necessary inputs and assumptions used to calculate this metric, including specifically, changes in net working capital, total depreciation and amortization, and capital expenditures; and

d.  AFFO, including all underlying necessary inputs and assumptions used to calculate this metric, including specifically, net income, depreciation & amortization, non-cash equity-based compensation expense, maintenance

capital expenditures, other non-cash items, and certain other items not core to operating performance.

48.     The Preliminary Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

49.     This information is necessary to provide Plaintiff, in his capacity as a Company stockholder, a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

50.     Without accurate projection data presented in the Preliminary Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the Goldman Sachs' financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Goldman Sachs*

51.     In the Preliminary Proxy Statement, Goldman Sachs describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

52.     With respect to the *Selected Companies Analysis*, the Preliminary Proxy Statement fails to disclose the following:

a.   The multiples, inputs, metrics and assumptions used to determine EV/ EBITDA

Multiples for each company compared, including specifically, the estimates of earnings before interest, taxes, depreciation and amortization; The specific IBES estimates used for each company compared;

b. The specific inputs, metrics, and assumptions for each company compared;

c. The IBES estimates used to determine both the EV/EBITDA multiple and the P/AFFO multiple for the Company;

d. The specific inputs and assumptions used to determine EV/ EBITDA Multiple range of 20.0x to 23.5x for calendar year 2022;

e. The specific inputs and assumptions used to determine EV/ EBITDA Multiple range of 18.3x to 21.6x for calendar year 2023;

f. The specific inputs and assumptions used to derive estimated AFFO per share multiples of 18.5x to 21.6x for calendar year 2022; and

g. The specific inputs and assumptions used to derive estimated AFFO per share multiples of 17.2x to 20.4x for calendar year 2023.

53. With respect to the *Illustrative Present Value of Future Share Price Analysis*, the Preliminary Proxy Statement fails to disclose the following:

a. The implied enterprise values for the Company, as of December 31 for each of fiscal years 2022 to 2024;

b. The inputs, metrics, and assumptions used to determine EV/NTM EBITDA multiples ranging from 22.0x to 26.0x for fiscal years 2023 to 2025;

c. The specific inputs and assumptions used to derive the selected range of T P/NTM AFFO multiples ranging from 21.0x to 25.0x;

d. The forecasted net debt as of December 31 for fiscal years 2022 to 2024;

    e.   The implied enterprise value calculated for the Company;

    f.   The range of illustrative implied equity values for the Company as of December 31 for each of the years 2022 to 2024;

    g.   The number of projected year-end fully diluted shares for years 2022 to 2024;

    h.   The inputs, metrics, and assumptions used to determine an illustrative discount rate of 8.2%;

    i.   The Company's cost of equity;

    j.   The beta for the Company; and

    k.   The specific general financial metrics for United States Markets used.

54.    With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumption used to determine discount rates ranging from 7.0% to 8.0%;

    b.   The Company's weighted average cost of capital;

    c.   The specific inputs and assumption used to determine perpetuity growth rates ranging from 2.0% to 2.5%;

    d.   The company's target capital structure weightings;

    e.   The Company's cost of long-term debt;

    f.   The Company's after-tax yield on permanent excess cash;

    g.   The projected future applicable marginal cash tax rate for the Company;

    h.   The beta for the Company;

    i.   The specific financial metrics for the United States financial markets consulted;

    j.   The ranges of illustrative enterprise values for the Company;

       k.   The net debt of the Company as of March 31, 2022;

       l.    The range of illustrative equity values calculated for the Company; and

       m.  The number of fully diluted outstanding shares of the Company's Common Stock.

55.    With respect to the *Selected Transactions Analysis*, the Preliminary Proxy Statement fails to disclose the following:

       a.   The value of each transaction compared;

       b.   The specific inputs, metrics, and assumptions for each transaction compared;

       c.   The specific closing date of each compared transaction;

       d.   The Company's net debt;

       e.   The number of fully diluted outstanding shares for the Company;

       f.    The inputs, metrics, and assumptions used to determine the applied EV/LTM EBITDA reference range of 26.0x for *Tier 1* transactions; and

       g.   The inputs, metrics, and assumptions used to determine the applied EV/LTM EBITDA range of 24.0x for *Other* transactions.

56.    With respect to the *Premia Analysis*, the Preliminary Proxy Statement fails to disclose the following:

       a.   The specific transactions compared; and

       b.   The premia paid in each individual transaction.

57.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

58.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value

and serves his interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Switch stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

**FIRST COUNT**

**Violations of Section 14(a) of the Exchange Act**

**(Against All Defendants)**

59.     Plaintiff repeats all previous allegations as if set forth in full herein.

60.     Defendants have disseminated the Registration Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

61.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

62.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or

oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

63.     The Registration Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

64.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

65.     The Individual Defendants were at least negligent in filing a Registration Statement that was materially misleading and/or omitted material facts necessary to make the Registration Statement not misleading.

66.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

### Violations of Section 20(a) of the Exchange Act

### <u>(Against all Individual Defendants)</u>

67.     Plaintiff repeats all previous allegations as if set forth in full herein.

68.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Registration Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

69.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Registration Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Registration Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Registration Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

70.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Switch's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information

available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Registration Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Registration Statement and are therefore responsible and liable for the misrepresentations contained herein.

71.     The Individual Defendants acted as controlling persons of Switch within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Switch to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Switch and all of its employees. As alleged above, Switch is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A.     Enjoining the Proposed Transaction;

B.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.     Directing the Individual Defendants to comply with the Exchange Act to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: June 24, 2022                        **BRODSKY & SMITH**

By: _____

Evan J. Smith
240 Mineola Boulevard
Mineola, NY 11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*